# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| JANE DOE, by and through her next friend and father, James Doe, JOHN DOE, by and through his next friend and father, James Doe,  Plaintiffs,  v.  GWINNETT COUNTY, GEORGIA, GWINNETT COUNTY SCHOOL DISTRICT, DETECTIVE JONATHAN LEACH, in his individual capacity,  Defendants. | Case No.: 1:19-cv-00813-MLB |

## AMENDED COMPLAINT FOR DAMAGES

Plaintiffs bring this action against Defendants under 42 U.S.C. § 1983, the Americans With Disabilities Act ("ADA"), 42 U.S.C. §12101 et seq., § 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504"), and the Fourth Amendment of the United States Constitution. In support, Plaintiffs offer the following.

1

<u>PARTIES</u>

1.      Plaintiff Jane Doe is a 20-year-old female, a United States Citizen,

and a resident of Georgia. Jane has Autism Spectrum Disorder and

speech and language impairment.

2.      Pursuant to O.C.G.A. § 29-4-21(a), Jane does not have the power to

bring this action due to the appointment of her father, James Doe, as

her legal guardian. Mr. Doe brings this action on Jane's behalf as her

next friend, pursuant to Fed R. Civ. P. 17(c)(2).

3.      Plaintiff John Doe, Jane's twin brother, is a 20-year-old male, a

United States Citizen, and a resident of Georgia. John has Autism

Spectrum Disorder and Emotional Behavioral Disorder.

4.      Pursuant to O.C.G.A. § 29-4-21(a), John does not have the power to

bring this action due to the appointment of his father, James Doe, as

his legal guardian. Mr. Doe brings this action on John's behalf as his

next friend, pursuant to Fed R. Civ. P. 17(c)(2).

5.      Defendant Gwinnett County Police Detective Jonathan Leach

("Detective Leach") is sued in his individual capacity. At all times

relevant to the complaint, Detective Leach acted under the color of law.

6.   Defendant Gwinnett County is a Georgia political subdivision subject to suit.

7.   Defendant Gwinnett County School District is a Georgia political subdivision subject to suit.

## JURISDICTION AND VENUE

8.   This action arises under the authority vested in this Court by virtue of 28 U.S.C. § 1331 and 28 U.S.C. § 1343 (a)(3).

9.   Upon service of process, this Court acquires personal jurisdiction of Defendants under Fed. R. Civ. P. 4(k)(1)(a).

10.   Venue is proper in the Atlanta Division of the Northern District of Georgia under 28 U.S.C. § 1391(b) because all actions complained of occurred within the boundaries of this district and Defendants reside within this district.

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

11.   Jane and John have Autism Spectrum Disorder. Autism is a neurological condition that affects how a person communicates with

and relates to other people and how they experience the world around them.

12. As individuals with autism, Jane and John experience heightened anxiety, which can significantly affect their ability to understand what is said to them and to make themselves understood.

13. As individuals with autism, John and Jane have difficulties understanding some types of spoken language, and have problems understanding non-literal language, understanding sentence structure, keeping a sentence in mind long enough to analyze its meaning, inferring what is meant from an unclear statement, understanding the level of detail an interviewer is seeking, becoming overloaded with spoken information, and understanding tones of voice.

14. As individuals with autism, John and Jane have difficulties communicating because of issues with providing a clearly sequenced narrative of events, finding the right words to explain something, and using complex words or phrases they have heard previously but do not fully understand.

15. Overall, the needs and difficulties associated with communication, memory and sensory issues with autism will be greatly increased for an individual when they are with unfamiliar people, in unfamiliar places and experiencing stressful events.

16. In 2017, Jane was a senior at Archer High School. Due to her disability, she received special education services.

17. In 2017, John was a senior at Archer High School. Due to his disability, he received instruction in a small classroom environment.

18. In January 2017, two students (K.E. and T.B.) at the High School began to bully John by threatening to publish a video of John having sex with his sister to other students at the school.

19. No such video actually existed, nor did John ever claim that such a video existed.

20. John was nevertheless fearful that those students would do something to cause him public humiliation.

21. Because John is autistic, he was particularly vulnerable to the other students' blackmail attempt.

22.  That K.E., attempted to blackmail John. In exchange for not releasing the video, the student told John that he had to give the student money.

23.  On January 12, 2017, a teacher at Archer High School reported to a school counselor that she overheard students in her class discussing an alleged video of John having sex with his sister.

24.  In response to this report, Ms. Coleman interviewed John in her office on January 13, 2017.

25.  John informed Ms. Coleman that that there was no video and that a student named K.E. started and spread the rumor in an attempt to extort money from him. John provided Ms. Coleman with a signed written statement to this effect.

26.  John showed and emailed Ms. Coleman a copy of a conversation between himself and K. E. in a series of text messages dated January 11, 2017 to that morning of January 13, 2017. The conversation begins with John asking K.E.  "Why ya do it telling people lies," to which K.E. responded, "LOL IDK." K.E. then repeatedly demanded money and told John that it "only gets worse till you pay up" and the

two arranged for John to give K.E. a pair of sneakers until he was able to obtain money.

27. There is no mention of a video in any of these text messages.

28. Ms. Coleman then interviewed K.E. who provided a signed written statement that John approached him accusing him of starting a rumor and offering him money to stop the rumor. The statement did not mention a video. K.E. admitted to demanding money and was in possession of the sneakers discussed in the text messages.

29. When asked by Ms. Coleman if he had seen a video, K.E. claimed that John showed him and another student, T.B., a video during the previous school year and told them that the girl in the video was his sister.

30. Ms. Coleman next interviewed T.B. who claimed that John sent him a video of two people having sex. T.B. said he did not see the girl's face but falsely claimed that John told him the girl was his sister. T.B. claimed he deleted the video shortly after receiving it.

31. Ms. Coleman then questioned Jane alone in her office. Jane said multiple times that she did not make a video with John. Ms. Coleman

asked Jane if John ever made her do anything she did not want to do

or that she thought was wrong or made her uncomfortable. Jane

answered no to each of these questions. Ms. Coleman noted that Jane

"seemed concerned' throughout the conversation and repeatedly asked

if she was in trouble.

32.    School Resource Officer P. Reed inspected John's phone during this

investigation and did not find any video.

33.    The school concluded the investigation, finding John innocent of any

wrongdoing and disciplining K.E. for extorting John. Ms. Coleman

informed Mr. Doe that the school administration did not believe the

video was real.

34.    On January 26, 2017, approximately two weeks after the investigation

concluded, Ms. Coleman learned from another teacher that John had a

younger sister at home.

35.    Ms. Coleman then decided to refer the matter to the Department of

Family and Children Services, who then referred to Detective Leach

for investigation.

36.    On February 16, 2017, approximately three weeks after the case was

referred, Detective Leach began his investigation by conducting

interviews at Archer High School.

37.    Ms. Coleman provided Detective Leach with extensive notes

documenting the school's investigation and informed Detective Leach

that the school concluded that John was being taken advantage of by

his classmates and that the video likely did not exist. SRO Reed

confirmed that no video was found on John's cell phone.

38.    Detective Leach then interviewed K.E., who claimed that John

showed him a video during the 2015-2016 school year in which an

unidentifiable male received oral sex from an unidentifiable female.

K.E. then claimed, for the first time, that John sent him the video as

well and that he deleted it shortly after viewing.

39.     Detective Leach noted that K.E. could not explain why he chose to

wait until the following school year to extort money from John.

40.    T.B. informed Detective Leach that John sent him a video of an

unidentifiable male having "actual sex" with an unidentifiable female,

which he deleted shortly after viewing. T.B. also to lied to Detective
Leach regarding whether K.E. had extorted John.

41.  K.E. and T.B.'s descriptions of the videos were entirely inconsistent.
K.E. claimed the video depicted oral sex while T.B. said it depicted
sexual intercourse. Neither student claimed that they could identify
the man in the videos as John, or the woman in the videos as Jane.

*Jane's Interview*

42.  Based upon direction from Detective Leach and with the knowledge
of Ms. Coleman, Jane was subsequently removed from class by a
school official and escorted to a room in the school where she was
met by Detective Leach.

43.  Both Detective Leach and Ms. Coleman were aware that Jane was
disabled before he began interviewing her. He noted that she
"appeared to be severely autistic" in his incident report.

44.  Detective Leach did not seek consent from Jane's father before
conducting the interview or otherwise inform her father that the
interview was occurring.

45.   Detective Leach did not speak to Jane's father or special education teachers in order to gain a better understanding of Jane's disability and how it would affect her ability to communicate with Leach during the interview.

46.   There was no pressing reason or exigency for Detective Leach to proceed with the interview without first taking these steps. He had already waited approximately three weeks after he was assigned the case to begin conducting the interviews, DFCS had already investigated, and there was no exigency.

47.   Ms. Coleman was present during the interview. Ms. Coleman is not one of Jane's special education teachers and did not have an existing relationship with Jane.

48.   Ms. Coleman and school administrators were aware of Jane's disability.

49.   Ms. Coleman was aware that Mr. Doe had been declared Jane's legal guardian. Despite this, no one from the school contacted Mr. Doe to seek consent before interviewing Jane.

11

50.     Detective Leach and Ms. Coleman did not offer Jane the opportunity
        to have a family member or teacher present during the interview to
        help Jane feel more comfortable and to assist Detective Leach in
        interviewing Jane in a way that would ensure effective
        communication.

51.     Ms. Coleman knew that Jane would be frightened and anxious during
        the interview. Ms. Coleman previously observed that Jane was
        anxious and afraid that she was in trouble during their initial meeting
        regarding the allegations against John in January 2017, and Jane's
        reaction to to the interview made it apparent to any observer that she
        was both frightened and anxious.

52.     The interview was conducted in a setting that was uncomfortable and
        unfamiliar to Jane.

53.     Jane was never told the purpose of the interview. Detective Leach
        only informed her that he wanted to "protect kids" and "make sure
        kids are safe."

54.     Jane was never told that she could decline to be interviewed.

55.   Detective Leach told Jane would not be in trouble as long as she "told the truth" during the interview.

56.   The interview lasted for nearly fifty minutes.

57.   Jane demonstrated significant fear and anxiety throughout the interview. Within the first few minutes, she asked if she was going to jail and requested that Ms. Coleman, a virtual stranger, hold her hand. During the interview, she cried and stated numerous times that she was scared. She asked if she was in trouble more than ten times over the course of the interview. Well into the interview, she expressed concern that the police were going to "get her" and that she was going to hear "bad reports."

58.   At the conclusion of the interview, Jane once again expressed fear that she might be in trouble and asked if she would have to go to jail or get bad reports.

59.   Detective Leach and Coleman never suggested that they take a break from the interview, despite Jane's obvious fear and anxiety.

60.   Jane was never told that she was free to take a break during the interview.

61. Jane repeatedly asked if the interview was done, beginning a mere six minutes into the interview. Detective Leach answered "almost" each time.

62. Jane was never told that she was free to terminate the interview or to leave the room, or that the interview was voluntary.

63. A year prior to the interview, a speech and language evaluation conducted old indicated that Jane had a significant receptive language impairment and functions at the early seven-year-old level.

64. Detective Leach frequently asked Jane questions using language that was far too complex for someone of Jane's developmental abilities to comprehend.

65. Detective Leach and Ms. Coleman knew that Jane was unable to adequately comprehend many of Detective Leach's questions.

66. Ms. Coleman did nothing during the interview to assist communication between Detective Leach and Jane. She said nothing other than a few vague assurances that Jane was not in trouble.

67. Detective Leach began the interview with questions about cooking pizza and grilled cheese, then asked general questions about Jane's

family, then abruptly began asking Jane to identify body parts on an anatomical diagram and state whether anyone has ever touched them. Detective Leach did not offer any explanation as to why he was asking these questions or attempt to transition into the topic in a manner that would help to avoid confusion or anxiety.

68.　In response to Detective Leach's questions, Jane described incidents of John laying on her and repeatedly stated that she and John were hugging. Jane stated that she and John "attached" to each other. When Detective Leach asked her what she meant by this, she again stated that John hugged her. Jane used the terms "attach" and "hug" interchangeably multiple times.

69.　Jane consistently answered yes every time Detective Leach asked her if she and John wore clothing during these encounters.

70.　Jane stated that she had not seen John's penis since she was little.

71.　Jane was unable to identify when the incidents occurred, stating repeatedly that she could not remember and that it was a "while ago."

72.　Jane informed Detective Leach that John was never using a cell phone during the times that they "attached."

15

73.   Detective Leach misinterpreted Jane's usage of the word "attached" to mean sexual intercourse.

74.   Jane's use of the word "attached" is strictly literal. For example, a pen that is set upon a table is "attached" to the table. This use of literal language is typical of autistic individuals and one of the reasons that someone familiar with Jane's speech and mannerisms (such as a family member or teacher) should have been present for the interview.

75.   Approximately eight minutes into the interview, Jane asked Detective Leach if her father was aware that she was being interviewed. Later, she asked Detective Leach to call her father while she was still present and he refused.

76.   Even after the interview was completed, neither Detective Leach nor anyone from the school phoned Jane's father to inform him of the investigation or Jane's interview. Jane phoned Mr. Doe herself; upset and asking why he had allowed the interview to occur.

*Consequences of Jane's Interview*

77.   Jane suffered and continues to suffer severe emotional distress as a result of this interview, including fear of police, anxiety, depression,

nightmares and night terrors, embarrassment, nervousness, and humiliation.

78. Shortly after the interview, Jane and her father saw a psychiatrist because Jane had been too distressed to return to school. The psychiatrist noted that Jane was visibly upset and continuing to ask if she was in trouble. She diagnosed Jane with generalized anxiety disorder and prescribed sedatives.

79. As a result of the interview, Jane was afraid to go to school and often had to be sedated to get through the school day. Accordingly, she frequently fell asleep in class and missed much of her senior year.

*John's Arrest*

80. Upon hearing from Jane about the interview, Mr. Doe came to the school to take her and John home. He asked to speak to Ms. Coleman or the school principal and was told that they were unavailable. He mentioned that he was planning to pick up his youngest daughter A.M. from middle school.

81. A School Resource Officer informed Mr. Doe that he would not be allowed to pick up A.M. from the middle school and directed Mr. Doe

to wait for detectives to return to Archer. Upon arrival, Detective

Leach told Mr. Doe of the allegations against John. Mr. Doe agreed to

take John to Gwinnett Police Headquarters to speak with Detective

Leach.

82.    When Mr. Doe and John arrived at Gwinnett Police Headquarters,

Detective Leach placed them alone in an interview room equipped

with a digital recording device.

83.    According to the incident report, the recorded conversation between

Mr. Doe and John contained the following:

a.    John told Mr. Doe he never touched or did anything to Jane.

b.    John told Mr. Doe he heard that K.E. made a fake video

pretending it was him and that K.E. was attempting to set him

up.

c.    John told Mr. Doe "I didn't do it. They probably grabbed a

video and edited it and made it look like me."

84.    When Detective Leach entered the room and began questioning John,

he maintained his innocence and invoked his right to an attorney.

85. Detective Leach concluded the interview. Instead of allowing John to obtain an attorney in order to continue the interview, he immediately placed John under arrest for Felony Incest in violation of O.C.G.A. § 16-6-22 and Felony Rape in violation of O.C.G.A. § 16-6-1.

86. Detective Leach then handcuffed John and transported him to Gwinnett County Jail for booking.

87. Immediately thereafter, Detective Leach obtained warrants for John's arrest.

88. By obtaining arrest warrants for John, Detective Leach initiated a prosecution against John for the crimes of incest and rape.

*There Was No Probable Cause to Believe John Committed Any Crime*

89. Detective Leach was aware of significant inconsistencies in K.E. and T.B.'s testimonies. He incorrectly interpreted John's compliance with extortion demands in his text message exchange with K.E. as an admission that a video existed, choosing to disregard John's message accusing K.E. of lying, and choosing to disregard John's disability and vulnerability to being manipulated and lied to. Detective Leach

19

further ignored evidence that John was only complying with the demands for money in an effort to stop the spread of false rumors.

90.   Detective Leach ignored that Jane was obviously not describing sexual intercourse with John during her problematic interview. He ignored the fact that Jane repeatedly insisted that she and John were always clothed, repeatedly described their behavior as hugging, and stated that she had not seen John's penis since they were small children.

91.   In addition to the statements made by Jane which denied that any sexual intercourse occurred, Detective Leach ignored that Jane had obvious and significant difficulty communicating, did not understand the purpose of the interview, and that her inability to communicate effectively precluded reliance on the information he received from Jane.

92.   Detective Leach acknowledged in his report that he did not give John an opportunity to provide testimony relevant to the probable cause determination because John invoked his right to an attorney.

93.   On February 22, 2018, Gwinnett Sexual Assault Center conducted a forensic interview of A.M., John's other sister living in the home. Detective Leach observed the interview. A.M. did not report any abuse whatsoever.

94.   In late March, Detective Leach obtained search warrants to conduct forensic examinations of John's phone and T.B.'s phone. The examiner did not find any incriminating evidence. There was no video or any messages discussing a video.

95.   John has never had any sexual contact with his sister Jane. There was no video of any such event because it never happened. John never showed or sent anyone any sort of video in which he claimed to be having sex with Jane. No such video was ever discovered because it did not exist.

96.   John was released from jail on bond on April 14, 2017, approximately two months after his arrest.

97.   After his release, John was still not permitted to return home due to restrictions on his bond requiring him to stay away from Jane. During that time, John lived with friends of the Does in Dacula, Georgia.

98.   All charges against John were administratively dismissed by the

Gwinnett County District Attorney's Office on June 2, 2017.

*Consequences of John's Arrest*

99.   John suffered and continues to suffer severe emotional distress as a

result of his arrest and incarceration, including anxiety, depression,

embarrassment, nervousness, and humiliation.

100.  Additionally, John suffered damage to his reputation as a result of

being arrested pursuant to a school investigation, of which many of

his peers were certainly aware.

<u>CLAIMS FOR RELIEF</u>

**<u>Count I</u>**
***Violation of 42 U.S.C. § 12132***
***Title II of the Americans with Disabilities Act***
(By Jane Doe against Gwinnett County and Gwinnett County School
District)

101.  This Count incorporates the factual allegations set forth above.

102.  Jane is disabled within the meaning of the ADA, 42 U.S.C. §

12131(2), because she actually and currently has autism, a physical or

mental impairment that substantially limits one or more major life

activities.

22

103.   Jane is qualified to receive law enforcement services from Gwinnett County.

104.   As a school-aged individual, Jane was qualified to receive public education services and participate in programs and activities provided by Gwinnett County School District.

105.   Defendants Gwinnett County and Gwinnett County School District are public entities under the ADA, 42 U.S.C. § 12131(1).

106.   The ADA prohibits discrimination against disabled individuals in providing governmental services such as law enforcement and public education. Defendants Leach and Coleman were agents, employees, or representatives of governmental entities that are required to comply with the ADA.

107.   Detective Leach and Ms. Coleman knew that Jane was a disabled person and that accommodation should have been provided to ensure that communication with Jane was as effective as it would be with other potential crime victims.

108.   Defendants discriminated against Jane because she was disabled, and
as a result, Jane was denied the benefits of equal services, programs
and activities of Defendants.

109.   Ms. Coleman was authorized to accommodate Jane's disability on
behalf of Gwinnett County School District. She could have refused to
permit Jane to sit for the interview, notified her father, or arranged for
another adult to attend the interview with Jane.

110.   Detective Leach was authorized to accommodate Jane's disability on
behalf of Gwinnett County. He did not have to report to any other
person regarding the time, place, location, or manner of the interview
he was conducting. He could have refused to permit Jane to sit for the
interview, notified her father, or arranged for another adult to attend
the interview with Jane.

111.   Detective Leach and Ms. Coleman's actions were intentional and/or
deliberately indifferent to Jane's rights under Section 504 and Title II
of the ADA and were the proximate cause of Jane's resulting
damages.

112.   Defendants should have made the following accommodations; all of
       which would have been reasonable under the ADA and other
       applicable law and would not have imposed an undue burden or
       required a fundamental change:

   a.   Spoken to Jane's father and special education teachers prior to
        the interview to gain a better understanding of Jane's disability
        and learn of any communication, cognitive, or conduct issues
        that would affect Jane during the interview.

   b.   Ensured that a familiar adult such as Jane's father or special
        education teacher was present during the interview.

   c.   Ensured that a parent or care provider such as Jane's special
        education teacher was present during the interview to assist
        Jane in understanding questions and assure that Jane's
        expressed communications were properly understood.

   d.   Informed Jane at the beginning of the interview that she was
        free to take a break at any time.

   e.   Questioned Jane using language that someone of her abilities
        could comprehend.

25

    f.     Scheduled breaks or afforded Jane opportunities to take breaks throughout the interview.

    g.     Changed the subject or called for a break when Jane demonstrated obvious signs of stress.

113.   By failing to make reasonable accommodation for Jane's obvious developmental disability in their provision of police services to the community, Defendants violated Title II of the ADA and are liable for all resulting damages.

**<u>Count II</u>**
***Violation of 29 U.S.C. §794***
***Section 504 of the Rehabilitation Act of 1973***
(By Jane Doe against Gwinnett County and Gwinnett County School
District)

114.   This Count incorporates the factual allegations set forth above.

115.   As recipients of federal funds, Gwinnett County and Gwinnett County School District are required by Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794) to make reasonable accommodations to persons with disabilities in their facilities, program activities and who receive their services. Such recipients are further required to modify such facilities, services, and programs as necessary to accomplish this

purpose. Accordingly, Defendants are subject to the mandate of Section 504.

116.   For the same reasons that Jane was deemed to have a disability for purposes of the ADA, Jane was also a qualified individual with a disability under Section 504.

117.   The same conduct of Defendants that constituted an ADA violation also constituted a failure to reasonably accommodate Jane's disability under Section 504.

118.   Defendants' above described failure to accommodate Jane's disability was intentional and/or deliberately indifferent to her rights under Section 504, thereby constituting violations of the Rehabilitation Act by recipients of federal funds for which Defendants are liable.

## <u>Count III</u>
### *Unlawful Seizure in violation of 42 U.S.C. §1983 and the Fourth Amendment*
(By Jane Doe against Gwinnett County and Gwinnett County School District)

119.   This Count incorporates the factual allegations set forth above.

120.   As detailed above, Jane was called out of class by school officials to meet with the police for an unstated purpose in an unfamiliar

27

administrative setting. She was not told that she was free to decline the interview or to leave, despite indicating her desire to do so multiple times.

121.  Gwinnett County School District has a policy governing interviews of suspected abuse victims. This policy allows only law enforcement officers to conduct these interviews and to ask the student if they wish to have a school employee present in the interview. The policy requires law enforcement officers, not school personnel, to contact the student's parents only after the interview has been completed, regardless of the suspected perpetrator.

122.  Gwinnett County has a policy derived from the policy of the Gwinnett County School District under which it performs interviews of students of the Gwinnett County School District as outlined in the preceding paragraph.

123.  Every reasonable person in Jane's position would feel compelled to comply with school and police authority figures and would believe that they were not free to leave.

124.   Under the Fourth Amendment, the conduct of Defendant Leach in causing Jane to remain in a school office despite her clear desire to leave constituted a seizure.

125.   This intrusive seizure, lasting almost fifty minutes, exceeded the scope of an investigatory stop and ripened into an arrest which must be supported by probable cause.

126.   Based upon the information known to Detective Leach at the time, no reasonable officer could have believed probable cause existed to justify Jane's detention.

127.   In the alternative, Jane's seizure was an investigatory stop that must be justified by reasonable suspicion.

128.   Based upon the information known to Detective Leach at the time, no reasonable officer could have believed reasonable suspicion existed to justify Jane's detention.

129.   In conducting Jane's seizure and interview, Detective Leach acted pursuant to the official policies of Gwinnett County and the Gwinnett County School District. The fact that there was no probable cause or reasonable suspicion was not relevant to Detective Leach because the

policy and practice of the School District and County did not require those findings prior to compelling a child to sit for an interview.

130.  In participating in the seizure and interview of Jane, Ms. Coleman acted pursuant to the policy of the Gwinnett County School District.

131.  Jane was seized pursuant to a policy of Defendants that allowed her to be interviewed despite the absence of a warrant, court order, probable cause, reasonable suspicion, parental consent or exigent circumstances.

132.  The illegal seizure of Jane was the proximate cause of Jane's damages arising from the interview.

### Count IV
#### *Fourth Amendment Violation under 42 U.S.C. § 1983*
(By John Doe against Detective Leach)

133.  This Count incorporates the factual allegations set forth above.

134.  Prior to his arrest, John had not committed any offense or violated any law that would authorize his arrest.

135.  Detective Leach initiated a criminal prosecution against John and no reasonable police officer could have believed that probable cause existed to support John's arrest.

136.   Detective Leach displayed a reckless disregard for John's
       constitutional rights.

137.   Detective Leach failed to set forth in his warrant affidavit sufficient
       facts to enable the magistrate to make an independent finding of
       probable cause. The affidavit does not articulate the basis for
       Detective Leach's belief that John committed the alleged crime or that
       he had personal knowledge of the circumstances of Plaintiff's
       involvement in the crime.

138.   Detective Leach initiated and maintained a criminal prosecution
       against John and he knew or should have known that no arguable
       probable cause existed to support John's arrest.

139.   The actions of Detective Leach were the proximate cause of John's
       arrest and incarceration and damages arising therefrom.

140.   Clearly established law shows that arresting an individual or seeking
       an arrest warrant without arguable probable cause violates the Fourth
       Amendment of the United States Constitution.

**<u>Count V</u>**
***Attorney's Fees under 42 U.S.C. § 1988, the ADA,
and Section 504 of the Rehabilitation Act***

141.  This Count incorporates the factual allegations set forth above.

142.  Upon prevailing in this action, Plaintiffs are entitled to recover reasonable attorney's fees under 42 U.S.C. § 1988(b), 42 U.S.C. § 12205, and 29 U.S.C. § 794a(b).

<u>REQUEST FOR RELIEF</u>

WHEREFORE, on the basis of the foregoing, Plaintiffs respectfully pray that this Court:

a)  Assume jurisdiction over this action;

b)  Hold a trial by jury on all issues so triable;

c)  Award general and special compensatory damages to each Plaintiff in an amount determined by the enlightened conscience of fair and impartial jurors;

d)  Award punitive damages against Detective Leach;

e)  Award reasonable attorney's fees, expenses, and costs of litigation;

f)  Award such other and further relief as this Court deems just and proper.

Respectfully submitted this 21st day of March, 2019.

s/Jeffrey R. Filipovits                  s/Jennifer Hickey

Jeffrey R. Filipovits                     Jennifer Hickey

Georgia Bar No. 825553              Georgia Bar No. 440019

FILIPOVITS LAW, PC               LAW OFFICE OF JENNIFER

2900 Chamblee-Tucker Road      HICKEY, LLC

Building 1                           1310 Rockbridge Rd SW Ste G2

Atlanta, GA 30341              Stone Mountain, GA 30087

678-237-9302                  770-674-8252

jeff@law.filipovits.com           jennifer@jenniferhickeylaw.com