## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JANE DOE, by and through her next friend and father, JAMES DOE; and JOHN DOE, by and through his next friend and father, JAMES DOE,

      Plaintiffs,

v.

GWINNETT COUNTY, GEORGIA; GWINNETT COUNTY SCHOOL DISTRICT; and DETECTIVE JONATHAN LEACH, in his individual capacity,

      Defendants.

Civil Action No.
1:19-cv-00813-SDG

## ORDER

This matter is before the Court on Defendant Detective Jonathan Leach's Motion to Dismiss [ECF 18]; Defendant Gwinnett County, Georgia's (the "County") Motion to Dismiss [ECF 19]; and, Defendant Gwinnett County School District's ("GCSD") Motion to Dismiss [ECF 23]. For the reasons stated below, the Court **DENIES** Detective Leach's motion; **GRANTS IN PART** and **DENIES IN PART** the County's motion; and **GRANTS** GCSD's motion.

## I.   Factual Background

The following facts are accepted as true for purposes of this Order.[1] Jane and John Doe are twins.[2] Both Plaintiffs have Autism Spectrum Disorder.[3] Autism is a neurological condition that affects how a person communicates with and relates to other people and experiences the world.[4] Plaintiffs experience heightened anxiety that can significantly affect their ability to understand others and make themselves understood.[5] This creates various communication issues, including difficulty understanding non-literal language and tones of voice, providing clearly sequenced narratives of events, and using the right words to explain something.[6] These difficulties are increased when a person with autism is with unfamiliar people, in unfamiliar places, or experiencing stress.[7]

---

[1]   *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1274 (11th Cir. 1999) ("At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.").

[2]   ECF 15, ¶ 3.

[3]   *Id.* ¶ 11.

[4]   *Id.*

[5]   *Id.* ¶ 12.

[6]   *Id.* ¶¶ 13–14.

[7]   *Id.* ¶ 15.

### a.    The School's Investigation

In 2017, Jane and John were seniors at Archer High School (the "School").[8]
Due to their disability, Jane received special education services and John received
instruction in a small classroom environment.[9] In January 2017, two other high
school students, KE and TB, began to bully John.[10] They threatened to publish
what they claimed was a video of John having sex with "his sister" to the other
students.[11]

On January 12, 2017, a teacher reported to the School's counselor that she
had overheard the students in her class discussing a video of John having sex with
his sister.[12] In response, Ms. Coleman, a School administrator,[13] interviewed John
in her office on January 13, 2017.[14] John told Ms. Coleman that the video did not
exist and explained that he was being blackmailed.[15] John also signed a written
statement to that effect and provided her a copy of a series of text messages

---

[8]    *Id.* ¶¶ 16–17.

[9]    *Id.*

[10]   ECF 15, ¶ 18.

[11]   *Id.*

[12]   *Id.* ¶ 23.

[13]   ECF 23-1, at 3.

[14]   ECF 15, ¶ 24.

[15]   *Id.* ¶ 25.

between KE and himself that occurred from January 11 to January 13, 2017.[16] In those text messages, KE makes repeated demands for money and tells John that it "only gets worse till you pay up."[17] The two arranged for John to give KE a pair of sneakers until John was able to obtain the money to pay him.[18] There is no video mentioned in their text messages.[19]

Ms. Coleman also interviewed KE who told her that John had accused him of starting a rumor and offered him money to stop the rumor.[20] KE admitted to demanding the money and admitted that he had in his possession the sneakers discussed in his text messages with John.[21] When asked if he had seen a video, KE claimed that John showed him and TB a video the previous year and had told them that the girl in the video was his sister.[22] Next, Ms. Coleman interviewed TB, who told her that John sent him a video of two people having sex.[23] TB claimed that he

---

[16]  *Id*. ¶¶ 25–26.

[17]  *Id*.

[18]  *Id*.

[19]  *Id*. ¶ 27.

[20]  *Id*. ¶ 28.

[21]  *Id*. ¶ 28.

[22]  *Id*. ¶ 29.

[23]  *Id*. ¶ 30.

could not see the girl's face in the video, but John told him the girl was his sister.[24] TB stated that he deleted the video shortly after receiving it.[25]

After interviewing the three boys, Ms. Coleman interviewed Jane.[26] Jane told Ms. Coleman multiple times that she had not made a video with John.[27] Ms. Coleman asked Jane if John ever made her do anything she did not want to do or something Jane thought was wrong or made her uncomfortable.[28] Jane replied in the negative to all of those questions.[29] Ms. Coleman noted that Jane seemed concerned throughout their conversation and repeatedly asked if she was in trouble.[30]

School Resource Officer ("SRO") Reed inspected John's phone during the school's investigation and did not find a video.[31] The School concluded its investigation, finding John had not done anything wrong and disciplining KE for

---

[24] *Id.*

[25] *Id.*

[26] *Id.* ¶ 31.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* ¶ 32.

blackmailing John.[32] Ms. Coleman informed James Doe (John and Jane's father) that the School administration did not believe the video was real.[33]

On January 26, 2017, approximately two weeks later, Ms. Coleman learned that John had another sister in addition to Jane, who is younger than John and Jane.[34] At that point, Ms. Coleman decided to refer the matter to the Department of Family and Children Services ("DFCS").[35] DFCS referred the matter to the Gwinnett County Police and Detective Leach for investigation.[36]

### b.   Detective Leach's Investigation

On February 16, 2017, approximately three weeks after the case had been referred to him, Detective Leach began his investigation by conducting interviews at the School.[37] Ms. Coleman provided Detective Leach with extensive notes documenting the School's own investigation and informed Detective Leach that

---

[32] *Id*. ¶ 33.

[33] *Id*.

[34] *Id*. ¶ 34.

[35] *Id*. ¶ 35.

[36] *Id*.

[37] *Id*. ¶ 36.

the School had concluded that John was taken advantage of and the video likely did not exist.[38] SRO Reed confirmed that no video was found on John's phone.[39]

Detective Leach interviewed KE who said that John had shown him (KE) a video the previous school year in which an unidentifiable male received oral sex from an unidentifiable female.[40] KE also claimed, for the first time, that John sent him the video but KE deleted it shortly thereafter.[41] Detective Leach noted that KE could not explain why he chose to wait until the following school year to blackmail John.[42] Detective Leach also interviewed TB who told him that John had sent a video of a male and female, both unidentifiable, having sexual intercourse.[43] TB claimed that he deleted the video shortly after viewing it.[44] TB also purportedly lied to Detective Leach regarding whether KE had blackmailed John.[45]

---

[38] *Id.* ¶ 37.

[39] *Id.* ¶ 37.

[40] *Id.* ¶ 38.

[41] *Id.*

[42] *Id.* ¶ 39.

[43] *Id.* ¶ 40.

[44] *Id.*

[45] *Id.*

Following KE's and TB's interviews, Detective Leach interviewed Jane. A year prior to the interview, a speech and language evaluation indicated that Jane had significant receptive language impairment and functions at the early seven-year-old level.[46]

To conduct the interview, at Detective Leach's direction and with Ms. Coleman's knowledge, Jane was removed from class by a school official and escorted to a room to meet with Detective Leach.[47] Detective Leach, Ms. Coleman, and School administrators were aware of Jane's disability before the interview began.[48] In his incident report, Detective Leach noted that Jane "appeared to be severely autistic."[49] Throughout the interview, Jane displayed significant fear and anxiety.[50] Within the first few minutes, Jane asked if she was going to jail and asked to hold Ms. Coleman's hand.[51] During the interview, Jane cried, stated numerous times that she was scared, and repeatedly asked if she was in trouble.[52]

---

[46] *Id.* ¶ 63.

[47] *Id.* ¶ 42.

[48] *Id.* ¶ 43, 48.

[49] *Id.*

[50] *Id.* ¶ 57.

[51] *Id.*

[52] *Id.*

Jane expressed fear and concern that the police were going to "get her" and that she was going to hear "bad reports."[53] Starting six minutes into the interview, Jane repeatedly asked if the interview was over.[54]

In response to Detective Leach's questions, Jane described incidents of John laying on her and stated that they were hugging.[55] Jane stated that she and John "attached" to each other.[56] When Detective Leach asked what "attached" meant, she stated that John hugged her.[57] Jane used the terms "attach" and "hug" interchangeably multiple times.[58] Jane could not remember when these encounters occurred, but she stated it was a "while ago."[59] Jane repeatedly told Detective Leach that she and John were clothed during these encounters.[60] Jane stated that

---

[53]   *Id.* ¶¶ 57–58.

[54]   *Id.* ¶ 61.

[55]   *Id.* ¶ 68.

[56]   *Id.*

[57]   *Id.*

[58]   *Id.*

[59]   *Id.* ¶ 71.

[60]   *Id.* ¶ 69.

she had not seen John's penis since she was little.[61] Jane stated that John was never using a cell phone during the times they "attached."[62]

Jane asked if her father, James Doe, was aware she was being interviewed eight minutes into the interview.[63] She later asked Detective Leach to call her father, but he declined.[64]

Jane alleges that she has suffered severe emotional distress since the interview.[65] She saw a psychiatrist because she was too distressed to return to school.[66] She was diagnosed with generalized anxiety disorder and prescribed sedatives.[67] Jane was afraid to go back to school and often had to be sedated to make it through the school day.[68] She frequently fell asleep in class and missed much of her senior year.[69]

---

[61]   *Id.* ¶ 70.

[62]   *Id.* ¶ 72.

[63]   *Id.* ¶ 75.

[64]   *Id.*

[65]   *Id.* ¶ 77.

[66]   *Id.* ¶ 78.

[67]   *Id.*

[68]   *Id.* ¶ 79.

[69]   *Id.*

After hearing about Jane's interview, James Doe came to the school to take Jane and John home.[70] At Detective Leach's request, James Doe agreed to take John to Gwinnett Police Headquarters to meet with him.[71]

When James Doe and John arrived at the Gwinnett Police Headquarters, they were placed in a room by themselves.[72] Their conversation was recorded.[73] During that conversation, John told his father that he never touched or did anything to Jane, that he heard KE had made a fake video and was attempting to set him (John) up.[74] John said, "I didn't do it. They probably grabbed a video and edited it and made it look like me."[75] When Detective Leach entered the room and began to question John, John maintained his innocence and invoked his right to an attorney.[76] In response, Detective Leach concluded the interview and placed John under arrest for felony rape and felony incest, in violation of O.C.G.A. §§ 16-6-1

---

[70]  *Id.* ¶ 80.

[71]  *Id.*

[72]  *Id.* ¶ 82.

[73]  *Id.* ¶ 83.

[74]  *Id.*

[75]  *Id.*

[76]  *Id.* ¶ 84.

and 16-6-22, respectively.[77] Detective Leach handcuffed John and transported him to Gwinnett County Jail for booking.[78] Immediately after arresting John, Detective Leach obtained warrants for John's arrest.[79]

### c.    Post-Arrest

On February 22, 2017, the Gwinnett Sexual Assault Center conducted a forensic interview of AM, John's younger sister.[80] AM did not report any abuse.[81] In late March, Detective Leach obtained search warrants to conduct forensic examinations of John's and TB's phones.[82] The examiner did not find a video or any messages discussing a video.[83]

On April 14, 2017, two months after his arrest, John was released from jail on bond.[84] John lived with friends of the Does because he was still not permitted

---

[77]  *Id.* ¶ 85.

[78]  *Id.* ¶ 86

[79]  *Id.* ¶ 87.

[80]  *Id.* ¶ 93. The Amended Complaint states this interview occurred in 2018, but it appears that was a typographical error.

[81]  *Id.*

[82]  *Id.* ¶ 94.

[83]  *Id.*

[84]  *Id.* ¶ 96.

to return home due to restrictions on his bond.[85] All charges against John were administratively dismissed by the Gwinnett County District Attorney's Office on June 2, 2017.[86] John alleges that he has suffered severe emotional distress as a result of his arrest and incarceration as well as damage to his reputation.[87]

## II.    Procedural Background

Plaintiffs filed this action on February 15, 2019.[88] On March 21, 2019, Plaintiffs amended their pleading.[89] The Court has jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343. Plaintiffs' Amended Complaint is split into separate claims alleged by different Plaintiffs against different Defendants. The Counts are as follows:

1. Count I: Violation of 42 U.S.C. § 12132 brought by Jane Doe against the County and GCSD;

2. Count II: Violation of 29 U.S.C. § 794 brought by Jane Doe against the County and GCSD;

3. Count III: Unlawful seizure in violation of 42 U.S.C. § 1983 and the Fourth Amendment brought by Jane Doe against the County and GCSD;

---

[85] *Id.* ¶ 97.

[86] *Id.* ¶ 98.

[87] *Id.* ¶ 99–100.

[88] ECF 1.

[89] ECF 15.

4.   Count IV: Violation of the Fourth Amendment under 42 U.S.C. § 1983 brought by John Doe against Detective Leach; and,

5.   Count V: Attorneys' fees under 42 U.S.C. § 1988, the ADA, and § 504 of the Rehabilitation Act.

On April 25, 2019, Detective Leach filed a motion to dismiss Count IV, the only Count asserted against him.[90] That same day, the County moved to dismiss Counts I, II, III, and V.[91] On April 29, 2019, GCSD moved to dismiss all the claims asserted against it.[92]

## III.   Applicable Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this standard does not require "detailed factual allegations," the Supreme Court has held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To withstand a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual

---

[90]   ECF 18.

[91]   ECF 19; ECF 19-1, at 2 n.3.

[92]   ECF 23.

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F. 3d 1283, 1289 (11th Cir. 2010) (*quoting Twombly*, 550 U.S. at 570). A complaint is plausible on its face when a plaintiff pleads sufficient factual content for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. *Id.* (*citing Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. A complaint must also present sufficient facts to "'raise a reasonable expectation that discovery will reveal evidence' of the claim." *Am. Dental Ass'n*, 605 F.3d at 1289 (*quoting Twombly*, 550 U.S. at 556).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (*quoting Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)). This principle, however, does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678.

**IV.    Detective Leach's Motion to Dismiss Count IV**

Count IV seeks to hold Detective Leach personally liable under 42 U.S.C. § 1983 for the alleged false arrest and malicious prosecution of John.[93] Section 1983 provides a "method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 140, 144 n.3 (1979). False arrest and malicious prosecution are cognizable claims under § 1983 for violations of the Fourth Amendment. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137, 1144 (11th Cir. 2007).

Detective Leach argues that this count should be dismissed because the existence of probable cause bars false arrest and malicious prosecution claims and he had probable cause to arrest and initiate the prosecution of John.[94] Alternatively, Detective Leach argues that, even if the Court finds a lack of actual probable cause, he is entitled to qualified immunity because there was arguable probable cause.[95] For the reasons explained below, the Court **DENIES** Detective Leach's motion.

---

[93]    ECF 15, ¶¶ 133–40.

[94]    ECF 18-1, at 8.

[95]    *Id*. at 15.

a.      **Probable Cause**

    i.      **Legal Standard**

The Court will first address whether there was probable cause to arrest John and initiate his prosecution because, as Detective Leach argues, the existence of probable cause defeats both the false arrest and malicious prosecution claims. *See Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) ("An arrest made with probable cause [ ] constitutes an absolute bar to a section 1983 action for false arrest.") (citation omitted); *Kjellsen v. Mills*, 517 F.3d 1232, 1237 (11th Cir. 2008) ("Because lack of probable cause is a required element to prove a § 1983 claim for malicious prosecution in violation of the Constitution, the existence of probable cause defeats the claim.") (citation omitted).

"[P]robable cause requires that 'the facts and circumstances *within the officer's knowledge,* of which he or she has *reasonably trustworthy information,* would cause a *prudent* person to believe, *under the circumstances shown,* that the suspect has committed, is committing, or is about to commit an offense.'" *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 n.11 (11th Cir. 2004) (quoting *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998)). The probable cause inquiry asks whether the action was "objectively reasonable based on the totality of the circumstances." *Kingsland*, 382 F.3d at 1226 (citing *Rankin*, 133 F.3d at 1435). "Probable cause does

not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.'" *Ortega*, 85 F.3d at 1525 (quoting *Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990)). The standard for establishing probable cause is the same for false arrest and malicious prosecution claims. *Kjellsen v. Mills*, 517 F.3d 1232, 1237 (11th Cir. 2008) (applying same standard in malicious prosecution claim); *see also Skop*, 485 F.3d at 1145 (remanding on malicious prosecution claim because questions of fact remained regarding existence of probable cause in connection with false arrest claim).

### ii.     Probable Cause for John's Arrest and Prosecution

Detective Leach's motion relies on the interviews of KE, TB, and Jane to establish probable cause.[96] For the reasons discussed below, the Court finds that these interviews do not support an objectively reasonable finding of probable cause at the motion to dismiss stage. Further, other factors within Detective Leach's knowledge at the time of John's arrest weighed against a conclusion that there was probable cause.

---

[96]   ECF 18-1, at 12 ("Taken together, the statements of Jane and John's classmates establish that probable cause existed for John's arrest.").

### 1.     KE and TB Interviews

In support of his motion, Detective Leach points to the statements by KE and TB that they had received a video from John during the prior school year that showed John having sex with Jane as providing evidence of probable cause.[97] Since the statements of the two classmates who were allegedly bullying and blackmailing John raise trustworthiness concerns, Detective Leach cites to *Craig v. Singletary* in support of his argument that the information provided by KE and TB was "reasonably trustworthy." 127 F.3d 1030 (11th Cir. 1997).[98]

In *Craig*, the Eleventh Circuit held that statements against interest by co-conspirators or co-defendants can "bear notions of reliability associated with statements against penal interest." 127 F.3d at 1045 (citing Fed. R. Evid. 804(b)(3)). That court explained:

> It might be argued that the notions of reliability associated with statements against interest are undercut by the interest that co-defendants have in shifting relative blame among themselves. . . . However, even when a co-defendant's confession seeks to shift some of the blame to another, the co-defendant's admission of guilt to the core crime is enough indication of "reasonably trustworthy information" to satisfy probable cause. . . . For purposes of determining whether there was probable cause to arrest [the plaintiff] for a

---

[97]  *Id*. at 9.

[98]  *Id*.

> felony, it matters not whether he was the robber who
> shot or the robber who did not.

*Id.* at 1045–46. Thus, a co-defendant's statements can be reliable because, by apportioning blame to a co-conspirator, the co-defendant admits that he also participated in the alleged crime. It is therefore, as the Circuit Court concluded, against the co-defendant's interest to make the statement.

However, the reasons supporting a finding of reasonable trustworthiness in statements made by a co-defendant or co-conspirator do not apply in this case. KE's and TB's statements were not against their penal interest. They had nothing to lose by claiming that the video existed because its existence does not implicate either one of them in a crime or wrongdoing. The School had already concluded its investigation and disciplined KE for blackmailing John.[99] KE and TB had every reason to lie regarding the existence of the video because, if anything, the existence of the video made their actions of blackmail seem less atrocious. Without the video, not only did they bully and blackmail one of their peers who has an intellectual disability, they also created the rumor that the same peer engaged in sexual relations with his twin for no reason but their own cruelty.

---

[99]   ECF 15, ¶ 33.

A reasonable person would have determined that KE and TB had nothing to lose in lying to Detective Leach, but rather had something to gain. As such, the information does not provide the same semblance of truth that can be attributed to a co-defendant's or co-conspirator's statements made against penal interest. Moreover, Detective Leach had numerous reasons to question the veracity of KE's and TB's statements. For example:

- Detective Leach was aware of the School's findings following its investigation that KE had blackmailed John and the video was not real;[100]

- Ms. Coleman told Detective Leach that classmates had taken advantage of John;[101]

- KE and TB provided contradictory information regarding the actual content of the video, *i.e.,* whether it depicted oral sex or sexual intercourse;[102]

- TB lied about whether KE blackmailed John;[103] and,

- KE could not explain why he had waited a year to blackmail John.[104]

---

[100]   ECF 15, ¶¶ 33, 37.

[101]   *Id*. ¶ 37.

[102]   *Id*. ¶¶ 38, 40.

[103]   *Id*. ¶ 40.

[104]   *Id*. ¶ 39.

Based on the information Detective Leach had at the time he arrested John, a reasonable person would have questioned the character and truthfulness of KE and TB. Consequently, their statements do not qualify as "reasonably trustworthy information" on which an officer can base a finding of probable cause.

### 2.      Jane's Interview

Since the Court finds that a reasonable person would have found that the information provided by KE and TB was not reasonably trustworthy, it must address whether Jane's statements, alone or in conjunction with KE's and TB's statements, can support Detective Leach's finding of probable cause. Detective Leach points to Jane's description of John "laying on her," which she stated was her and John hugging, and Jane's statement that she and John "attached" to each other, as evidence that Jane and John had sexual intercourse.[105] He claims that he "rightfully believed Jane's account, as he understood it."[106] In support of this argument, Detective Leach points to cases where police officers were found to have reasonably depended on uncorroborated evidence of child victims.[107] Once again, however, Detective Leach's citations differ from the facts of *this* case in at

---

[105]  ECF 18-1, at 10.

[106]  *Id.*

[107]  *Id.*

least one significant way—here, the disabled alleged victim did not report any abuse.

For example, Detective Leach cites to *Lowe v. Aldridge*, where the officers relied on the testimony of three children and a psychotherapist in seeking a warrant for the arrest of the alleged perpetrators. 958 F.2d 1565, 1568 (11th Cir. 1992). The plaintiff in that case alleged the officer "relied on stale evidence and failed to advise the court issuing the warrant that other doctors had examined the children and had not concluded that they had been abused." *Id*. at 1570.

Two factors from that case are immediately distinguishable. First, the children in that case explicitly reported being abused. *Id*. at 1568. Second, the officer in *Lowe* requested the presence of a psychotherapist who had previously met with the children. *Id*. Thus, while there was exculpatory information from other sources, the officer had the children's statements reporting a crime and the psychotherapist's belief that the children were credible.

Here, in contrast, Detective Leach knew that Jane was severely disabled but, at least according to the Amended Complaint, he did not attempt to adjust for her disability by (for example) enlisting the help of a trained professional, her legal guardian (James), or one of Jane's special education teachers for the interview. Nor

did he, according to the Amended Complaint, follow up with any of those sources following the interview to help him understand Jane's responses.

Most significantly, Jane did not report any sexual abuse. Rather, Detective Leach interpreted Jane's use of the word "attached" to mean that John sexually abused his sister, allegedly without the consultation of any trained professional or other trustworthy source to validate his belief. Detective Leach claims that this understanding was reasonable and relies on *Devereaux v. Abbey*, a Ninth Circuit opinion that held, "[i]nterviewers of child witnesses of suspected sexual abuse must be given some latitude in determining when to credit witnesses' denials and when to discount them." 263 F.3d 1070, 1075 (9th Cir. 2001).[108]

In *Devereaux*, the alleged child victim originally denied being abused but later stated that she had been a victim of and a witness to sexual abuse by her foster parent. *Id.* at 1073. Here, the issue is not whether Detective Leach was reasonable in choosing to rely on Jane's statements about the alleged (lack) of abuse when compared to earlier denials, it is whether Detective Leach was reasonable in reaching the conclusion that the word "attached" (while clothed) meant John was sexually abusing his sister without additional trustworthy

---

[108]  ECF 18-1, at 11.

evidence. Based on Jane's other statements during the interview, a reasonable person would not have believed that Jane's use of the word "attached" implied sexual abuse.

For example, the Amended Complaint asserts that Jane used the word "attach" and "hug" interchangeably multiple times and Jane consistently answered in the affirmative when asked if she and John were clothed during their "attached" encounters.[109] Jane also stated that she had not seen John's penis since they were little, John never used a cell phone when they "attached" (which would have corroborated KE's and TB's allegations concerning the video) and those encounters occurred a while ago.[110] These further descriptions of the "attached" encounters show that Detective Leach's conclusion that "attached" meant sexual intercourse was unreasonable based on the allegations in the Amended Complaint. Consequently, based on those allegations, the Court finds that a reasonable person looking at the totality of the circumstances would not have determined that Jane's interview—either standing alone or coupled with KE and TB's statements—supported a finding of probable cause.

---

[109]   ECF 15, ¶¶ 68–69.

[110]   *Id*. ¶¶ 70, 72, 71.

### 3.      Additional Exculpatory Information

Detective Leach accurately asserts that once an officer has probable cause, he need not investigate further before making the arrest.[111] "Nevertheless, an officer may not choose to ignore information that has been offered to him or her . . . . Nor may the officer conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts." *Kingsland*, 382 F.3d at 1229. Thus, when the officer already has the additional exculpatory information in front of him, he cannot ignore that information in making his probable cause analysis.

Detective Leach had knowledge of exculpatory evidence before arresting John. Beyond the exculpatory statements from Jane's interview discussed above, SRO Reed told Detective Leach that no video was found on John's phone.[112] Detective Leach had the School's file of its investigation, during which the School determined that KE had blackmailed John and a video likely did not exist.[113] He had conflicting statements from both KE and TB regarding the content of the

---

[111]  ECF 18-1, at 12.

[112]  ECF 15, ¶ 37.

[113]  *Id*. ¶¶ 33, 37. It is not clear whether the School's investigation notes included evidence such as the texts between KE and John where John accuses KE of lying. *Id*. ¶ 26. If that evidence was in Defendant Leach's possession before the arrest, it further demonstrates the unreasonableness of Defendant Leach's conclusion.

video, *i.e.*, whether it depicted oral sex or sexual intercourse.[114] Finally, he heard John proclaim his innocence and explain what had happened to his father while they were being recorded, presumably without their knowledge,[115] at the Gwinnett Police Headquarters.[116] This information, having been provided to Detective Leach prior to his arrest of John, could not be ignored in his probable cause calculation, despite any possible concern he may have had about trying to protect a disabled, alleged victim of sexual abuse.

### 4.   Finding of Probable Cause in the Arrest Warrant

Detective Leach points to the arrest warrant for John as proof that his probable cause analysis was reasonable.[117] However, the fact that Detective Leach was able to obtain a warrant after John's arrest does not alter the Court's analysis in this case. While a magistrate judge's finding of probable cause is normally entitled to great deference, "there are a few exceptions to this rule of deference." *Holland v. City of Auburn, Ala.*, 657 F. App'x. 899, 903 (11th Cir. 2016). A warrant

---

[114] *Id*. ¶¶ 38, 40.

[115] While the Amended Complaint does not state that John and James were unaware of the recording device, Plaintiffs' response to Defendant Leach's motion refers to their conversation as "covertly recorded." ECF 30, at 16.

[116] ECF 15, ¶ 83.

[117] ECF 18-1, at 14.

affidavit can violate the Fourth Amendment "when it contains omissions made intentionally or with a reckless disregard for the accuracy of the affidavit." *Madiwale v. Savaiko*, 117 F.3d 1321, 1326–27 (11th Cir. 1997) (*United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)).[118] Further, the presumption of validity provided to warrants is lost "where the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984)).

At this motion to dismiss stage, we do not know what information the warrant affidavit contained, and what (if any) exculpatory information was excluded. John has sufficiently alleged facts to support his allegation that warrant exceptions plausibly apply in this case.[119] Given the possible applicability of these exceptions, the finding of probable cause in the warrant affidavit is not entitled to deference at this stage of the litigation. If appropriate, Detective Leach can raise

---

[118] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit issued before October 1, 1981.

[119] ECF 15, ¶ 135 ("Detective Leach initiated a criminal prosecution against John and no reasonable officer could have believed that probable cause existed to support John's arrest.").

this defense again at summary judgment, after the parties have had a chance to engage in discovery.

Treating the allegations of the Amended Complaint as true, the Court finds that John has plausibly pled that Detective Leach violated his Fourth Amendment rights by arresting him and initiating his prosecution without probable cause. As such, the Court must now address whether Detective Leach is nevertheless entitled to qualified immunity.

### b.    Qualified Immunity

Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[120] The qualified immunity analysis involves a two-pronged approach. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Court must determine (1) if there was a constitutional violation; and (2) whether that

---

[120] The parties do not dispute that Defendant Leach was acting in his discretionary authority during the investigation and subsequent arrest of John. ECF 18-1, at 12.

violation was of a clearly established constitutional right. *Rodriguez v. Farrell*, 280 F.3d 1341, 1345 (11th Cir. 2002).

The constitutional right to not be arrested or prosecuted without probable cause is clearly established. *Kingsland*, 382 F.3d at 1232 ("Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment.") (quoting *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003)); *see also Skop*, 485 F.3d at 1143–45 (holding that arrest without probable cause violates Fourth Amendment for purposes of malicious prosecution or false arrest claim). However, an officer who makes an arrest or initiates a prosecution without probable cause will still be entitled to qualified immunity if *arguable* probable cause existed. *Skop*, 485 F.3d at 1137. Therefore, John's § 1983 claim is barred if Detective Leach had arguable probable cause to arrest John for the crimes of felony incest and felony rape.

> An officer has arguable probable cause to arrest where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest. To determine whether an officer had arguable probable cause, we ask whether the officer's actions are objectively reasonable regardless of the officer's underlying intent or motivation. This standard does not shield officers who unreasonably conclude that probable cause exists.

*Carter v. Butts Cty., Ga.*, 821 F.3d 1310, 1320 (11th Cir. 2016). In order to show a lack of arguable probable cause, the plaintiff "must demonstrate that no reasonable officer could have found probable cause under the totality of the circumstances." *Kingsland*, 382 F.3d at 1232.

Since the arguable probable cause inquiry is objective, Detective Leach's subjective belief as to whether he had probable cause is immaterial. Rather, the issue is whether an officer in the same circumstances and possessing the same knowledge as Detective Leach could have believed that he had probable cause to arrest John. The Court finds that a reasonable officer in Detective Leach's position could not have believed that probable cause existed.

Taking all well-pleaded allegations as true and drawing all reasonable inferences in the light most favorable to Plaintiffs, the Court finds that the following facts would have prevented a reasonable officer from believing probable cause existed. First, a reasonable officer would not have believed that KE and TB were reasonably trustworthy sources. As discussed above, there was evidence that KE and TB took advantage of John and that KE blackmailed John; their stories conflicted; and, it was in their interest to promote the lie that John had sent them the video.

Second, a reasonable officer could not have reached the same conclusion as Detective Leach that Jane's use of the word "attached" during her interview, absent confirmation from some other source, provided probable cause that she had been sexually abused by her brother. When asked what "attached" meant, Jane said John hugged her.[121] She used the terms "attach" and "hug" interchangeably multiple times.[122] Jane repeatedly confirmed that she and John were clothed during their "attached" encounters.[123] Further, she told Detective Leach that "she had not seen John's penis since she was little"; that the encounters happened a "while ago"; and, that "John was never using a cell phone during the times they 'attached.'"[124]

Third, the other exculpatory information readily available to Detective Leach would have prevented a reasonable officer from believing he had probable cause to arrest John. That exculpatory information includes, *inter alia*, SRO Reed's finding that the video did not exist on John's phone, John's recorded conversation with his father explaining the blackmail scheme and denying that any such video

---

[121]  ECF 15, ¶ 68.

[122]  *Id.*

[123]  *Id.* ¶ 69.

[124]  ECF 15, ¶¶ 70–72.

existed, and the school's finding that KE was blackmailing John and that the video likely did not exist. And most exculpatory of all is the fact that Jane at no time made any allegation of sexual abuse about John. Consequently, taking the allegations of the Amended Complaint as true, even arguable probable cause did not exist.

The Court concludes that, at least at this stage of the litigation, Plaintiffs have plausibly pled that Detective Leach violated clearly established law by arresting and initiating the prosecution against John without probable cause, and that he is not entitled to qualified immunity. Detective Leach will, however, still be able to raise the qualified immunity defense at a later stage. *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1285 (11th Cir. 2000) ("We stress, however, that defendants retain the right to assert the qualified-immunity defense at the next stage of the proceedings (and, for that matter, throughout the proceedings) as more facts are developed.").

**V.      The County's Motion to Dismiss**

On April 25, 2019, the County moved to dismiss Counts I, II, III, and V.[125]

For the reasons stated below, the Court **GRANTS** the motion as to Count III and

**DENIES** the motion as to Counts I, II, and V.

**a.      Count III: Unlawful Seizure**

In her response to the County's motion, Jane states that she does not oppose

the dismissal of Count III but requests that it be dismissed without prejudice.[126]

Count III alleges that the County has a policy that allowed Detective Leach to

unlawfully seize Jane for the course of her interview.[127] While Jane still contends

that the actions of Detective Leach constituted an unlawful seizure, she asserts that

she is no longer able to point to a specific policy that would impose liability on the

County under *Monell v. Department of Social Services of City of New York*, 436 U.S.

658, 690 (1978).[128] As explained in her response, after Jane filed her Amended

Complaint, GCSD provided a copy of the policy on which Jane had based her

*Monell* claim.[129] In reviewing the policy, Plaintiffs discovered it does not apply to

---

[125]   ECF 19.

[126]   ECF 29, at 21–24.

[127]   ECF 15, ¶¶ 119–32.

[128]   ECF 29, at 21–24.

[129]   *Id*. at 23.

Jane and John because they were both over eighteen during Detective Leach's investigation.[130]

Jane recognizes that, due to this change in circumstances and the fact that Count III was pled as a *Monell* claim (rather than an individual capacity claim), the cause of action may no longer be viable.[131] Given (1) Jane's candidness in alerting the Court that the policy on which Count III was based does not apply for reasons not raised in the County's motion to dismiss and (2) that this case has not yet entered discovery, the Court finds no reason to bar Jane from bringing a future *Monell* claim should the circumstances so warrant.[132] Accordingly, Count III is **DISMISSED WITHOUT PREJUDICE**.

### b.   Counts I and II: ADA and § 504 Claims

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the

---

[130] *Id*. at 23–24.

[131] *Id*. at 24.

[132] Contrary to the County's assertions, Jane did not "selectively drop" this claim by filing an inappropriate Notice of Dismissal as was the case in *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1106 (11th Cir. 2004). *See* ECF 34, at 13 n.11. Jane sufficiently addressed the County's motion to dismiss arguments regarding this count and requested that the Court dismiss it without prejudice. Since the Court has determined that such a dismissal is appropriate, it does not rule on the substance of the County's arguments with regard to Count III.

benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). This Court addresses claims made under the ADA and § 504 of the Rehabilitation Act together because "'[d]iscrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases,' and '[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa.'" *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1088 n.21 (11th Cir. 2007) (quoting *Cash v. Smith,* 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000)).[133] For purposes of this Order, the Court's findings regarding the ADA claim apply equally to Jane's Rehabilitation Act claim.

---

[133] The Rehabilitation Act has an additional federal funding requirement. 29 U.S.C. § 794(a). However, the County has not disputed that it receives federal funding and both parties agree that the ADA and Rehabilitation Act should be considered together. ECF 19-1, at 2 n.4; ECF 29, at 3 n.1.

In order to state a claim under the ADA, the plaintiff must allege: "(1) that [s]he is a 'qualified individual with a disability;' (2) that [s]he was 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.'" *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (quoting 42 U.S.C. § 12132). The County does not dispute that Jane is a "qualified individual" or that the County is a "public entity" under the ADA. Rather, the County argues that Jane has failed to allege (1) the second element because she was not denied a benefit or otherwise discriminated against, and (2) the third element because she was not denied a reasonable accommodation.[134] Additionally, the County argues that, even if Jane has sufficiently alleged a violation, Counts I and II must be dismissed because she cannot show intentional discrimination as is required for a compensatory damages claim under the Acts. Jane responds that she has sufficiently alleged a violation of her right to communicate. The Court will address each argument in turn.

---

[134]  ECF 19-1, at 2–12.

### i.   Denial of a Benefit or Discrimination by a Public Entity

In order to allege the second element of a Title II claim, Jane must show that she was either excluded from or denied the benefits of a public entity's services, programs, or activities, *or* was otherwise discriminated against by a public entity. *Shotz*, 256 F.3d at 1079. Jane claims that she was denied the right to communicate as effectively with the police as other alleged victims who are not disabled.[135]

The County argues that Jane has failed to show she was "denied the benefits of equal services, programs, and activities" under the first provision of § 12132.[136] It asserts that Jane does not have a right to equally effective communication because there is "no right to have criminal complaints investigated by the police."[137] In support of this contention, the County points to *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). *DeShaney*, however, addresses whether the Due Process Clause of the Fourteenth Amendment creates an affirmative duty for the state "to protect the life, liberty, and property of its citizens against invasion by private actors." 489 U.S. at 195. The County fails to show how that holding applies to a public entity's duty to disabled

---

[135]   ECF 15, ¶ 107.

[136]   ECF 19-1, at 5 (quoting 42 U.S.C. § 12132).

[137]   ECF 19-1, at 5–6.

individuals under the ADA or Rehabilitation Act *after* the state initiates a criminal investigation.

Nevertheless, the County is correct that the Eleventh Circuit has not determined whether Title II's "services, programs, or activities" provision includes police conduct. In *Bircoll v. Miami-Dade County*, however, the Eleventh Circuit held that police conduct falls under the second provision of § 12132, which protects those who are "subjected to discrimination" by a public entity. *Bircoll*, 480 F.3d at 1084; *see also Montgomery v. D.C.*, No. CV 18-1928 (JDB), 2019 WL 3557369, at *8 (D.D.C. Aug. 5, 2019) ("Every court of appeals to have considered the question has found that Title II applies to police conduct under at least the second provision.") (citing *Gray v. Cummings*, 917 F.3d 1, 16 (1st Cir. 2019); *Haberle v. Troxell*, 885 F.3d 170, 180 (3d Cir. 2018); *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 338 (4th Cir. 2012) (holding that "the ADA applies to police interrogations"); *Bircoll*, 480 F.3d at 1084–85 (11th Cir. 2007); *Hainze v. Richards*, 207 F.3d 795, 801–02 (5th Cir. 2000); *Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999)). As explained by the Eleventh Circuit, "the final clause in Title II 'is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the

context.'" *Bircoll*, 480 F.3d at 1085 (quoting *Bledsoe v. Palm Beach Cty. Soil & Water Conservation Dist.*, 133 F.3d 816, 821–22 (11th Cir. 1998)).[138]

In *Bircoll*, the hearing-impaired plaintiff claimed that he was denied accommodations after being pulled over for a potential DUI. *Bircoll*, 480 F.3d at 1075. The plaintiff claimed that he was discriminated against during various sobriety tests and his incarceration. *Id*. at 1085.

> Specifically, [the plaintiff] argues that he was entitled to effective communication with the police throughout his arrest; that he needed auxiliary aids, such as an oral interpreter, for effective communication during these tests; and that the police failed to make reasonable modifications to their procedures to ensure effective communication, thereby subjecting him to discrimination in violation of the ADA.

*Id*. The Eleventh Circuit accepted this argument and went on to address the reasonableness of the proposed accommodations. *Id*. In so doing, it necessarily recognized that effective communication with a police officer is a cognizable claim under the ADA's catch-all provision.

---

[138]  Additionally, as Jane notes, the Department of Justice's guidance on the issue "states the 'services, programs, and activities' covered by the ADA include '[i]nterviewing and questioning witnesses, victims, or parties . . . .'" ECF 29, at 6 (quoting U.S. Dep't of Justice, Examples and Resources to Support Criminal Justice Entities in Compliance with Title II of the Americans with Disabilities Act (Jan. 2017), *available at* https://www.ada.gov/cjta.html)).

The Amended Complaint alleges the same violation accepted by the Eleventh Circuit in *Bircoll*. It plausibly pleads that Jane had the right to effective communication with Detective Leach throughout her interview and he failed to make reasonable accommodations to ensure such communication, thereby subjecting Jane to discrimination in violation of the ADA. As a result, the County's actions through Detective Leach fall under the protection of the ADA and the question becomes whether Detective Leach discriminated against Jane by failing to provide a reasonable accommodation. *See Bircoll*, 480 F.3d at 1085 ("In our view, the question is not so much one of the applicability of the ADA because Title II prohibits discrimination by a public entity by reason of [the plaintiff's] disability. The exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance.").

### ii. Reasonable Accommodations

The third element of a Title II case requires showing discrimination against Jane by reason of her disability. *Shotz*, 256 F.3d at 1079. "[T]he plaintiff can establish the third element by illustrating that the public entity refused to provide a reasonable accommodation for the disabled person." *Medina v. City of Cape Coral, Fla.*, 72 F. Supp. 3d 1274, 1278 (M.D. Fla. 2014); *see also Todd v. Carstarphen*, 236 F.

Supp. 3d 1311, 1327 (N.D. Ga. 2017) (recognizing failure to make reasonable accommodations as one of three viable discrimination theories under Title II).

> To establish a Title II violation under a reasonable accommodation theory . . . a plaintiff must show (1) she is a qualified individual with a disability, (2) she is unable, because of her disability, to meaningfully access a public benefit to which she is entitled, and (3) the public entity failed, despite her request, to provide a reasonable accommodation for her disability.

*Todd*, 236 F. Supp. 3d at 1327.

"A reasonable accommodation need not be perfect or the one most strongly preferred by the plaintiff . . . [i]t must be 'effective' and provide the disabled plaintiff with 'meaningful access' to the benefit she seeks." *Id.* at 1334 (quoting *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016)); *see also Bircoll*, 480 F.3d at 1081–82 ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.") (quoting 28 C.F.R. § 35.130(b)(7)). Exigent circumstances presented by criminal activity can affect the reasonableness inquiry. *Bircoll*, 480 F.3d at 1085–86.

Whether an entity provided appropriate accommodations for a disabled individual "is inherently fact-intensive." *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 342 (11th Cir. 2012); *see also Bircoll*, 480 F.3d at 1085 ("The reasonable-modification inquiry in Title II-ADA cases is 'a highly fact-specific inquiry.'") (quoting *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1527 (11th Cir. 1997)). Circuit courts have found that the inquiry is often inappropriate for summary judgment, much less at the motion-to-dismiss stage. *See Liese*, 701 F.3d at 342 (citing *Chisolm v. McManimon*, 275 F.3d 315 (3d Cir. 2001); *Randolph v. Rodgers*, 170 F.3d 850 (8th Cir. 1999); *Duffy v. Riveland*, 98 F.3d 447 (9th Cir. 1996)).

The Amended Complaint states numerous accommodations the County could have taken in order to ensure effective communication during the interview.[139] Those accommodations include: speaking with James Doe or Jane's special education teachers to gain a better understanding of her disability, or having one of them present during the interview; informing Jane that she was free to take a break during the interview or scheduling breaks during the interview; using language that Jane could understand; or changing the subject or taking a break when Jane demonstrated obvious signs of stress.[140] However, the County

---

[139]  ECF 15, ¶ 112.

[140]  *Id.*

argues that these accommodations were not reasonable because (1) they were not necessary; (2) exigent circumstances existed that made them unreasonable; and (3) Jane did not make the requisite request for an accommodation.[141] These arguments are discussed in turn.

### 1.    Necessity

In support of the argument that the accommodations were not necessary, the County asserts that Jane is not entitled to obtain a benefit beyond what is available to the general public and the general public is not entitled to an "error free" police investigation.[142] It further claims that, even if it had made all of the accommodations alleged by Jane, "it cannot be assumed" that the communication would have been more effective.[143]

The County's arguments mischaracterize the right asserted by Jane. Jane does not claim that she is entitled to an "error free" police investigation; she asserts the right to effectively communicate with a police officer. The accommodations proposed by Jane would not have made the investigation error free, but could have greatly improved her ability to communicate with Detective Leach. For example,

---

[141]  ECF 19-1, at 6–12.

[142]  *Id.* at 7–8.

[143]  *Id.* at 8.

the Amended Complaint asserts that Jane demonstrated significant fear and anxiety throughout the interview.[144] In support of this allegation, it notes that Jane asked to hold Ms. Coleman's hand even though Ms. Coleman was "a virtual stranger" to Jane.[145] Given Jane's request, it is not far-fetched to assume that she would have been comforted by the presence of one of her special education teachers, allowing her to communicate more clearly and effectively.

Even assuming (contrary to the applicable legal standard on a motion to dismiss) that the presence of one of Jane's teachers would have fundamentally altered the interview, there were other possible accommodations that would have taken little time and effort. Detective Leach could have spoken to one of Jane's teachers to receive more context regarding Jane's linguistic abilities, including her strictly literal use of words.[146] This might have had an impact on Detective Leach's strained interpretation of Jane's use of the word "attached."

---

[144]   ECF 15, ¶ 57.

[145]   *Id*.

[146]   *See id*. ¶ 74 ("The use of literal language is typical of autistic individuals and one of the reasons that someone familiar with Jane's speech and mannerisms (such as a family member or teacher) should have been present for the interview.").

The County also asserts that notifying James Doe of the interview could have jeopardized the purpose of the investigation because he might have discouraged Jane from incriminating John.[147] While the possibility that one accommodation might hinder the investigation could make *that* accommodation unreasonable, it has no effect on the other possible accommodations. The County does not and cannot reasonably claim that all the proposed accommodations might have inhibited the investigation.

Finally, the County notes that it is not required to take "*all* conceivable steps . . . to improve communications with disabled persons, particularly when such functions would hamper the timeliness or efficacy of criminal justice operations."[148] While this may be true, it does not mean the County was entitled to take *no* conceivable steps to assist Jane. Moreover, Jane never alleges that the County was required to make all of her proposed accommodations. Further, most, if not all, of the proposed accommodations would likely increase the efficacy and decrease the length of the interview. Beyond the utility of involving one of Jane's special education teachers, it is plausible that accommodations such as allowing

---

[147]  ECF 19-1, at 8, 12.

[148]  *Id*. at 8–9.

Jane to take breaks would have decreased her anxiety and allowed for a more effective and informative interview.

### 2.    Exigent Circumstances

In support of its argument that exigent circumstances existed that made the accommodations unreasonable, the County relies on *Bircoll*.[149] The *Bircoll* plaintiff alleged that he was discriminated against by not being provided a reasonable accommodations at three stages of the police investigation and subsequent arrest, including during: (1) the field sobriety tests on the roadside after being pulled over; (2) the consent warning before an Intoxilyzer test at the police station; and (3) his incarceration. *Bircoll*, 480 F.3d at 1085.

Regarding the field sobriety tests, the Eleventh Circuit held that waiting for an oral interpreter before taking the tests is not a reasonable accommodation "given the exigent circumstances of a DUI stop on the side of a highway, the on-the-spot judgment required of police, and the serious public safety concerns in DUI criminal activity." *Bircoll*, 480 F.3d at 1086. For the Intoxilyzer test's consent warning, "the exigencies of the situation were greatly reduced" because the plaintiff was at the police station instead of the roadside. *Id*. at 1087. However, the

---

[149]  *Id*. at 11.

Court found that the officer was able to effectively communicate without an accommodation because, *inter alia*, the plaintiff could understand 50% of what is said when lipreading, the consent warning "although important, is short and not complex," and the plaintiff was provided a written copy of the warning to read. *Id*. at 1087–88. Finally, the Court found that the plaintiff was unable to show an injury from being denied access to a telecommunication device for the deaf ("TDD") since a police officer agreed to place a call for him and he was able to effectively use the regular phone in the same manner he used his cellphone. *Id*. at 1088.

This case is easily distinguishable from *Bircoll* for many reasons. Unlike the plaintiff in *Bircoll*, Jane's interview did not occur on the side of the road; the evidence of the crime was not fleeting (as is the case in a DUI stop because the driver's inebriation level will fluctuate over time); nor was this a physical test where the need for effective verbal communication was limited. Additionally, Jane's ability to communicate with Detective Leach could not be accommodated by providing her with a written form—the entire purpose of their interaction was for them to verbally communicate with each other. Finally, Jane was not a *suspect*; she was the alleged *victim* of a crime that had occurred a year previously. Applying the reasoning behind *Bircoll* to this case, the Court finds that exigent circumstances

did not exist here that would have prevented Detective Leach from reasonably accommodating Jane's disability.

The County also argues that the level of urgency is heightened when the alleged victim lives with the alleged perpetrator.[150] However, this argument is not supported by the three-week delay between when the School first referred the matter to DFCS and when Detective Leach began his investigation.[151] Furthermore, the proposed accommodations would have delayed the interview a short period of time at most. The County has not shown how such a delay would have negatively affected the investigation or hurt the alleged victim, Jane.

The County further argues that deciding which accommodations to provide for an autistic individual would have required timely, individualized analysis.[152] The Court does not find this argument persuasive. The accommodation standard is "reasonable," not "perfectly tailored." *Todd*, 236 F. Supp. 3d at 1334. Imbedded

---

[150]  ECF 19-1, at 10.

[151]  ECF 15, ¶¶ 34–35.

[152]  *Id.* at 11. The only ADA case the County cites in support of this argument is *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270 (11th Cir. 2018). However, that case provides no support for the idea that a public entity is not required to accommodate the specific needs of autistic children. Rather, the case finds that a Disney policy accommodating all autistic children based on the needs of the most severely impaired child is not *per se* impermissible under Title III of the ADA. 900 F.3d at 1290–92.

in the reasonableness calculation is a cost-benefit analysis that accounts for police officers' need to respond quickly and the rights of disabled individuals. Here, Detective Leach had the opportunity and responsibility to reasonably accommodate for Jane's autism.

### 3.    Failure to Request

Finally, the County argues that it was not required to provide an accommodation because Jane never requested one.[153] In support of this argument, the County cites to a Title I ADA case, *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361 (11th Cir. 1999). However, as Jane argues, the relationship between an employee and employer at issue under Title I is readily distinguishable from the Title II case presently before the Court. Employees have an ongoing relationship with their employers through which they can raise their disabilities and make specific requests for accommodations prior to when the accommodation becomes critical.

For instance, in *Gaston*, the plaintiff employee was informed about a new job requirement during a meeting with her manager. *Id*. at 1362. However, the plaintiff failed to request an accommodation during that meeting and resigned three weeks

---

[153]  *Id*. at 11.

later without an explanation. *Id.* at 1364. In contrast, Jane was a severely autistic high school student who met Detective Leach for the first time at the start of her interview. In such a circumstance, it would be unreasonable to require Jane to immediately request an accommodation at the beginning of the encounter. Furthermore, the Amended Complaint *does* indicate that Jane sought an accommodation as best she could under the circumstances and given her disability. She asked if she was going to jail, cried, and worried about being in trouble;[154] she stated numerous times that she was scared and expressed fear;[155] she asked Ms. Coleman to hold her hand;[156] she repeatedly asked if the interview was over;[157] and shortly after the start of the interview, she asked Detective Leach to call her father.[158]

Additionally, when considering Title II ADA cases, other courts in this judicial district have found that notice of a disability may be sufficient for a reasonable accommodation claim. *Todd*, 236 F. Supp. 3d at 1328 ("A specific demand may be unnecessary where the need for an accommodation is obvious.");

---

[154]   ECF 15, ¶ 57.

[155]   *Id.* ¶¶ 57–58.

[156]   *Id.* ¶ 57.

[157]   *Id.* ¶ 61.

[158]   *Id.* ¶ 75.

*see also Rylee v. Chapman*, No. CIV.A. 2:06-CV-0158-RWS, 2008 WL 3538559, at *8 (N.D. Ga. Aug. 11, 2008), *aff'd*, 316 F. App'x 901 (11th Cir. 2009) (granting summary judgment where hearing-impaired plaintiff failed to request accommodation and there was no evidence or argument that public entity had notice of impairment). The Court finds that notice was sufficient here where Detective Leach knew of Jane's disability and there were no exigent circumstances preventing him from evaluating appropriate accommodations that could be taken to ensure effective communication. Detective Leach had complete control over the situation. Even if he did not realize the extent of Jane's disability prior to starting the interview, Detective Leach could have stopped the interview to evaluate appropriate accommodations once he realized that Jane "appeared to be severely autistic," as he noted in his incident report, or after she began using the term "attach" interchangeably with "hug" in a manner that was, at best, difficult to interpret.[159]

The County's citation to *Flood v. City of Jacksonville*, where the court held that an intellectually disabled plaintiff must specifically request an accommodation does not alter the Court's analysis. 263 F. Supp. 3d 1213, 1217 (N.D. Ala. 2017). *Flood* relies on *Gaston* and another Eleventh Circuit employment discrimination

---

[159] *Id.* ¶¶ 43, 68.

case, which, for the reasons stated above, this Court finds distinguishable. *Flood*, 263 F. Supp. 3d at 1224 (citing *Bagwell v. Morgan Cty. Comm'n*, 676 F. App'x 863, 866 (11th Cir. 2017)). In *Flood*, the police officers were responding to a potentially dangerous situation involving an intellectually disabled plaintiff holding a box cutter. 263 F. Supp. 3d at 1217. After being told to drop "the knife" an officer shot and killed the plaintiff. *Id*. The exigency of the situation in *Flood* would have prevented an officer from assessing the obviousness of the plaintiff's intellectual disability and the appropriateness of an accommodation. Not only is that *not* the situation Detective Leach faced here, it bears repeating that Jane was the alleged victim—not a suspect.

Furthermore, other district courts in the Eleventh Circuit support the conclusion that a request is not necessary where the disability is obvious or known to the defendant. For example, the Middle District of Georgia has held:

> To establish that a public entity discriminated against him, a disabled plaintiff may allege that "the public entity refused to provide a reasonable accommodation" despite his request for accommodation or despite the obviousness of the need for an accommodation.

*Smith v. Fye*, No. 517CV00406TESMSH, 2018 WL 6046453, at *8 (M.D. Ga. Nov. 19, 2018); *see also Nattiel v. Fla. Dep't of Corr.*, No. 115CV00150WTHGRJ, 2017 WL 5774143, at *1 (N.D. Fla. Nov. 28, 2017) (holding lack of request not fatal where

defendant has knowledge of disability); *Schwarz v. The Villages Charter Sch., Inc.*, 165 F. Supp. 3d 1153, 1173 (M.D. Fla. 2016), *aff'd sub nom, Schwarz v. Bd. of Supervisors on behalf of Villages Cmty. Dev. Dists.*, 672 F. App'x 981 (11th Cir. 2017) (holding plaintiff must establish accommodation was requested or obvious). Courts in other circuits have reached the same conclusion. *See, e.g., Sacchetti v. Gallaudet Univ.*, 181 F. Supp. 3d 107, 130 (D.D.C. 2016) ("[W]here a 'disability is obvious and indisputably known to the provider of services, no request is necessary.'") (quoting *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 270 (D.D.C. 2015)); *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006) (finding request usually required because disability and need for accommodation are otherwise unknown but different rules may apply when need for accommodation is obvious).

For the reasons stated above, the Court finds that the Amended Complaint plausibly pleads each element of an ADA claim. Accordingly, Jane has sufficiently alleged a violation of the ADA and the Rehabilitation Act. The Court must now address whether her claim must nevertheless be dismissed for failure to allege intentional discrimination.

### iii.    Intentional Discrimination

To prevail on a claim for compensatory damages under the ADA, it is not enough to show that the County violated Jane's rights; Jane must also show that the County did so with discriminatory intent. *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014). In *Liese v. Indian River County Hospital District*, the Eleventh Circuit determined that a plaintiff can prove discriminatory intent through deliberate indifference or discriminatory animus. 701 F.3d at 344. Deliberate indifference requires a showing that "the defendant *knew* that harm to a federally protected right was substantially likely and *failed* to act on that likelihood." *Id*. For an organization to be held liable, there must be (1) an official who, (2) at a minimum has the requisite knowledge of the discrimination and the authority to address it. *Id*. at 349. "[A]n official is someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." *Id*. at 350.

The County argues that the Amended Complaint fails to show that Detective Leach knew his actions were substantially likely to violate Jane's

rights.[160] The official's knowledge is a question of fact often inappropriate even at the summary judgment stage, much less the motion-to-dismiss stage. *Liese*, 701 F.3d at 351 n.12 ("To be sure, a reasonable juror could also find that the doctors honestly believed that [the plaintiff] did not need any interpretive aid. . . . However, this is an issue of material fact to be resolved at trial, not on summary judgment."). At this early stage of the proceedings, Jane has plausibly alleged that Detective Leach knew there was a substantial likelihood that Jane would be unable to communicate effectively absent a reasonable accommodation.

"Where the substantial likelihood of harm is obvious, a jury may infer that the defendant had actual knowledge of that substantial risk of harm." *McCullum*, 768 F.3d at 1147. The Amended Complaint pleads numerous facts from which a jury could infer that Detective Leach had actual knowledge of that substantial risk. It alleges that Detective Leach knew Jane was disabled before he began interviewing her and that his incident report stated Jane "appeared to be severely autistic."[161] During the interview, Jane purportedly asked Ms. Coleman if she could hold her hand, cried, stated numerous times she was scared and repeatedly

---

[160]  ECF 19-1, at 13.

[161]  ECF 15, ¶ 43.

asked if she was in trouble.[162] It also claims that, starting six minutes into the interview, Jane repeatedly asked if the interview was done, and, eight minutes into the interview, she requested Detective Leach to call her father.[163] These facts are sufficient to support a finding that Detective Leach knew Jane would be unable to effectively communicate during the interview absent a reasonable accommodation.

The County also argues that Detective Leach does not qualify as an "official" for purposes of imputing liability on it. This inquiry is also ill-suited for a motion to dismiss. *Liese*, 701 F.3d at 350 ("The question of how far up the chain of command one must look to find an 'official' is necessarily a fact-intensive inquiry."). Nonetheless, the Court finds that the Amended Complaint plausibly pleads that Detective Leach qualifies as an official. As noted above, the official must have "complete discretion at a 'key decision point' in the administrative process." *Id*. (quoting *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1255 (11th Cir. 2010)).

The Amended Complaint sufficiently alleges that Detective Leach had complete discretion at key decision points during *his* investigation. It asserts that

---

[162]  *Id*. ¶ 57.

[163]  *Id*. ¶¶ 61, 75.

Detective Leach conducted all the interviews at the School that day, including Jane's.[164] It claims that Detective Leach was the one who instructed the School to remove Jane from her class for the interview.[165] While Ms. Coleman was present during the interview, it is clear that Detective Leach ran it.[166] This is further supported by the assertion that Detective Leach "did not have to report to any other person regarding the time, place, location, or manner of the interview he was conducting."[167] As such, the Amended Complaint sufficiently alleges that Detective Leach had complete control over the investigation and, consequently, had the authority at a "key decision point" to accommodate Jane's disability.

For the reasons discussed above, the Court finds that the Amended Complaint plausibly pleads (1) a violation under the ADA and Rehabilitation Act and (2) intentional discrimination through deliberate indifference. Accordingly, the Court **DENIES** the County's motion to dismiss Jane's claim for compensatory damages under the ADA and Rehabilitation Act.

---

[164]  ECF 15, ¶¶ 38, 40, 42.

[165]  *Id*. ¶ 42.

[166]  *Id*. ¶ 66 ("Ms. Coleman did nothing during the interview to assist communication between Detective Leach and Jane. She said nothing other than a few vague assurances that Jane was not in trouble.").

[167]  ECF 15, ¶ 110.

## VI.    Defendant GCSD's Motion to Dismiss

GCSD moves to dismiss Counts I, II, and III of the Amended Complaint.[168] GCSD argues that the Amended Complaint fails to state a discrimination claim against it because the pleading fails to allege GCSD: (1) provided a service, program, or activity; (2) intentionally discriminated or failed to make reasonable accommodations; and (3) violated Jane's rights with discriminatory intent as required for compensatory damages.[169] GCSD also argues that Jane lacks standing to assert discrimination claims against it.[170]

The Court agrees that the Amended Complaint fails to allege facts that show GCSD discriminated against Jane by reason of her disability. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Jane's claim is predicated on the idea that police conduct during an investigation constitutes a service, program, or activity

---

[168]  ECF 23. In Jane's response to GCSD's motion, she reaffirmed that she does not oppose the dismissal of Count III. GCSD does not oppose dismissal of this Count without prejudice. ECF 32, at 2. Therefore, the Court dismisses Count III without prejudice for the same reasons discussed under section V.a., *supra*.

[169]  ECF 23, at 6–14.

[170]  *Id*. at 18.

or otherwise discriminatory conduct under the ADA.[171] Jane alleges that she was discriminated against because she was denied the right to equally effective communications with a police officer during a police investigation.[172] Thus, the public entity that allegedly discriminated against Jane is not GCSD, but the County (through its police force). Ms. Coleman's presence in the interview does not change this basic and dispositive fact.

Jane does not allege that she was denied the benefit of a service, program, or activity run by GCSD. Nor does she allege that GCSD separately subjected her to discrimination. Rather, her response to GCSD's motion asserts that (1) "the ADA applies to police interview[s] of potential victims," and (2) GCSD is a "joint participant for its role in preventing Jane from enjoying the equal benefit of effective communication in a police interview."[173] Jane provides no support for the argument that a public entity can be held jointly liable under the ADA and Rehabilitation Act for the discriminatory administration of a right provided by an entirely separate public entity.

---

[171]  ECF 31, at 4–11.

[172]  ECF 15, ¶ 107.

[173]  ECF 31, at 4, 8.

GCSD points to this flaw in its motion, arguing that it cannot be held liable for the actions of a different public entity. It cites various cases that have held a public entity is not liable for the activities performed by its contractors or licensees, and it argues that the relationship between GCSD and the police is even more attenuated.[174] Jane responds that the cases cited by GCSD do not apply because they "concern whether a public entity is liable under Title II for discrimination by a related *private* entity."[175] However, she points to no authority to support her claim that a public entity can be held liable for the actions of another public entity.

While Jane is right that GCSD's public entity status is significant in that it allows GCSD to be held directly liable for violations under the ADA, Jane does not assert any discrimination by GCSD. The discrimination Jane allegedly suffered stems from her interview by Detective Leach during his investigation and, therefore, is solely attributable to the County.[176] *See Wendel*, 80 F. Supp. 3d at 1305

---

[174] ECF 23-1, at 7–8 (citing *Schwarz*, 165 F. Supp. 3d at 1153; *Wendel v. Fla. Dep't of Highway Safety & Motor Vehicles*, 80 F. Supp. 3d 1297 (M.D. Fla. 2015); *Noel v. New York City Taxi & Limousine Comm'n*, 687 F.3d 63 (2d Cir. 2012); *Tyler v. City of Manhattan*, 849 F. Supp. 1429 (D. Kan. 1994)).

[175] ECF 31, at 8.

[176] Jane emphasizes this point in the Amended Complaint by noting that Defendant Leach "did not have to report to any other person regarding the time, place, location, or manner of the interview he was conducting." ECF 15, ¶ 110.

("[T]he Department is not responsible for a violation that it did not directly carry out; this analysis is equally applicable to the RA and ADA claims, which both require a showing of discrimination on behalf of the Department.").

Jane's response also points to the Protocol Order[177] attached as Exhibit 1 to GCSD's motion as evidence that GCSD and the police "regularly work in tandem to interview potential child abuse victims."[178] However, the Protocol Order is not an agreement between GCSD and the County police. Rather, the Protocol Order involves numerous public agencies and is the result of O.C.G.A. § 19-15-2, which requires each county to establish a protocol "for the investigation and prosecution of alleged cases of child abuse." While the Protocol Order necessitates some collaboration between the School and the police, it clearly states that school personnel are only allowed in a police interview if the child so wishes, and the personnel "are not allowed to interrupt or interject themselves into the interview

---

[177]   ECF 23, at 21–80.

[178]   ECF 31, at 9. The Court may take judicial notice of the Protocol Order as it is a court document. *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 (11th Cir. 2015) ("Courts may take judicial notice of publicly filed documents, such as those in state court litigation, at the Rule 12(b)(6) stage.") (citing Fed. R. Evid. 201; *Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013)). The Protocol Order is also "the policy" referenced in the Amended Complaint as the basis for Count III's *Monell* claim. ECF 15, ¶¶ 119–32. Therefore, it is also incorporated by reference under Fed. R. Civ. P. 10(c).

process."[179] Thus, the Protocol Order does not show that GCSD had any control over the allegedly discriminatory interview.

The Court finds that Jane has failed to plausibly plead an ADA or Rehabilitation Act violation on behalf of GCSD. Jane's discrimination claim relies on her asserted right to equally effective communication with the police. The public entity in charge of administering that right is the County. Accordingly, Jane has not sufficiently alleged any substantive claims against GCSD and GCSD's motion to dismiss all the claims against it is **GRANTED**.

In Jane's response to GCSD's motion, she requests leave to amend her pleading should the Court grant the motion to dismiss.[180] Fed. R. Civ. P. 15(a)(2) supports district court's freely granting such motions when justice so requires. But the decision of whether to grant leave to amend is committed to the sound discretion of the trial court. *S. Grouts & Mortars., Inc. v. 3M Co.*, 575 F.3d 1235, 1240 (11th Cir. 2009); *Faser v. Sears Roebuck & Co.*, 674 F.2d 856, 860 (11th Cir. 1982); *Layfield v. Bill Heard Chevrolet Co.*, 607 F.2d 1097, 1099 (5th Cir. 1979); *Interstate Nat'l Dealer Servs., Inc. v. U.S. Auto Warranty, LLC*, No. 1:12-cv-04265-RWS, 2015 WL 13273318, at *8 (N.D. Ga. Dec. 11, 2015) ("[L]eave to amend is by no means

---

[179] ECF 23-1, at 28.

[180] ECF 31, at 22.

automatic."). The Eleventh Circuit has advised that a court should deny leave when "there is [a] substantial ground for doing so, such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Reese v. Herbert*, 527 F.3d 1253, 1263 (11th Cir. 2008). *See also Campbell v. Emory Clinic*, 166 F.3d 1157, 1162 (11th Cir. 1999) (court may choose not to allow a party to amend "when the amendment would prejudice the defendant, follows undue delays, or is futile").

Here, any amendment of the claims against GCSD would be futile. The Amended Complaint and Plaintiff's response to GCSD's motion fail to allege any factual or legal basis for holding GCSD accountable under the ADA or Rehabilitation Act. Nor has Plaintiff provided a proposed amendment that cures these deficiencies. Consequently, the Court finds that GCSD should be dismissed from this action with prejudice.

## VII.   Conclusion

For the reasons stated above, the Court **DENIES** Detective Leach's motion to dismiss Count IV of the Amended Complaint [ECF 18]. The Court **GRANTS IN PART** and **DENIES IN PART** Gwinnett County's motion to dismiss Counts I, II,

and III [ECF 19]. The Court **DENIES** the motion to dismiss Counts I and II and **GRANTS** the motion to dismiss Count III **WITHOUT PREJUDICE**. The Court **GRANTS** Gwinnett County School District's motion to dismiss [ECF 23]. The Clerk is **DIRECTED** to **DISMISS** Gwinnett County School District from this action **WITH PREJUDICE**.

Defendants Leach and Gwinnett County shall file their answers to the Amended Complaint within 21 days from entry of this Order. The parties shall conduct their Rule 26(f) conference within 14 days from the date the remaining Defendants file their answers. The parties shall serve their initial disclosures and submit a Joint Preliminary Report and Discovery Plan within 30 days from the date the Defendants file their answers. Discovery will commence 30 days after the Defendants file their answers.

**SO ORDERED** this the 2nd day of April 2020.

_____
Steven D. Grimberg
United States District Court Judge